UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


UNITED STATES OF AMERICA                    CRIMINAL NO. 03-cr-50033(3)

VERSUS                                       JUDGE WALTER

REGAN GATTI                                  MAGISTRATE JUDGE HORNSBY


## REPORT AND RECOMMENDATION

**Introduction**

Regan Gatti ("Defendant") and five other men were indicted for four felony charges arising from an armored car robbery and related events.  All but Defendant pleaded guilty. Defendant went to trial and was convicted on all four counts.  Defendant was sentenced to more than 40 years in prison.  He was also convicted in state court on related charges and received a state sentence of more than 100 years.

Defendant appealed his federal conviction and sentence, and they were affirmed.  His counsel filed a Motion to Vacate (Doc. 318) pursuant to 28 U.S.C. § 2255, which Defendant supplemented with a pro se memorandum.  Doc. 355.  Judge Walter issued a Memorandum Ruling (Doc. 371) that denied all but five of the claims asserted in the motion.  He referred those five claims to the undersigned for a hearing and report and recommendation.  One of those claims, an assertion that counsel failed to appeal a sentencing issue regarding the loss amount calculation, was denied with consent.  Doc. 387.

The court appointed counsel to represent Defendant and held a series of conferences to prepare the case for a hearing.  The hearing date was continued more than once, the final witness and exhibit lists were eventually filed, and subpoenas were issued.  Defendant then fired his appointed attorney, retained attorney Joseph W. Bailey, and asked for a continuance. Docs. 411-13.

The evidentiary hearing was eventually held on September 21, 2009.  A transcript of the hearing appears at Doc. 423. Defendant fired Mr. Bailey at least twice during the hearing, but their differences were resolved sufficiently to permit Mr. Bailey to complete the hearing. The court allowed the filing of post-hearing memoranda, but defendant fired Mr. Bailey for a final time shortly before the filing deadline. Mr. Bailey was allowed to withdraw (Doc. 430), and Defendant filed a pro se post-hearing memorandum. Doc. 428.  The Government filed its own memorandum. Doc. 431. After considering the evidence and the arguments of the parties, and for the reasons that follow, it is recommended that the claims referred to the undersigned be denied.

**Background Facts**

On March 13, 2003, at approximately 9:30 a.m., an armored car was making a delivery at the Hibernia Bank in Shreveport, Louisiana.  Four men, armed with AK-47 rifles and semi-automatic handguns, emerged from a Suburban. The men were dressed in black and wore ski masks and gloves.  The robbers ordered the armored-car guards to the ground.

The robbers disarmed the guards, and two of the robbers held the guards at gunpoint. One guard was handcuffed, but Defendant could not get the handcuffs on the second guard. The other robbers transferred $780,000 in cash from the armored car to the Suburban. The robbers drove the Suburban to a nearby apartment complex, transferred the money to a green Dodge Caravan, doused the Suburban with gasoline, and drove off in the van.  Residents of the apartment complex who saw the suspicious activity called 911 and reported the license plate number of the green van.

Shreveport City Police Office Mark Sharbano, who was in a marked squad car, spotted the van as it traveled east on Interstate 220 towards Bossier City.  As he pursued the van, one of the robbers blew out the back window of the van and began firing.  Officer Sharbano was shot in the left arm and forced to pull over. A fellow officer who had joined the chase continued to pursue the robbers.  Defendant testified in the federal trial that he was on the floor of the van with his head down while two of his co-defendants fired at the officer. Trial Tr. 425. But in the state court prosecution, Defendant was convicted of aggravated flight from an officer, based on evidence that "Gatti was firing an AK-47 at the officer, ultimately forcing him off the road." State v. Gatti, 914 So.2d 74, 85 (La. App. 2d Cir. 2005).

The van drove across the Red River into Bossier City and proceeded into a residential neighborhood where Larry Thompson, Jr. drove the van into an open garage.  The robbers got out of the van and tried to enter the home, but the homeowner locked the door, called

911, armed himself with a handgun, and fired through the door.  The robbers fled the garage and scattered into the neighborhood. After a series of other dangerous events, which will be discussed below, Defendant and the other robbers were captured or surrendered to police.

A federal grand jury returned a four-count indictment against Larry N. Thompson, Sr., Larry Neal Thompson, Jr., Regan Gatti, Nicholas B. Gentry, Anthony R. Gentry, and Tung Nguyen.  Doc. 61.  The indictment charged each of the men with: (1) conspiracy to "knowingly use and carry, and possess" firearms in furtherance of robbing an armored car, in violation of 18 U.S.C. § 924(o); (2) robbery of a bank in violation of 18 U.S.C. §§ 2113(a) and (d), and 2; (3) knowingly using and carrying firearms "during and in relation to a crime of violence," in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii) and 2; and (4) knowingly possessing stolen firearms in violation of 18 U.S.C. §§ 922(j) and 2. A trial jury convicted Defendant on all four counts.

**Bogus Theory of Defense**

Defendant argues that his trial attorney, Daryl Gold, rendered ineffective assistance because, during his opening statement, Gold said that Defendant had fired at police officers, but Defendant later testified that he did not shoot at the officers.  Defendant argues that his testimony was on the advice of counsel, and the conflict between the opening statement and Defendant's testimony undermined the defense.

Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel.  Counsel's performance was

deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. 104 S.Ct. at 2068.

The shooting at issue happened in the Bossier City neighborhood where the robbers were arrested. Police officers Willis and Creighton were among the many officers searching the neighborhood. They encountered Defendant, who was armed with a holstered 9 mm pistol and wearing a ski mask and bullet-resistant vest. Officer Willis pointed a Remington 870 12-gauge pump shotgun at Defendant and ordered him to get down on the ground.

The prosecution offered in its opening statement that Defendant did not get down as ordered but sprang up and began shooting his pistol at the officers. The officers returned fire, and one of Officer Willis's shotgun rounds hit Defendant in the foot. The prosecution stated that Defendant then ran behind a corner of the house and continued firing at the police. Tr. 7.

Attorney Gold, in his opening statement, suggested that shots were fired in the area, but not by Defendant. He asserted that the shots that startled officers Willis and Creighton, and made them begin firing, came from officers in a nearby backyard who were also involved in the search for the robbers. Gold stated:

> Well, as soon as the two police officers in the backyard who had
> told Regan to get down heard those shots, they started firing.
> And they hit him, they shot him.
>
> Did he shoot back? Yes.  He ran to the back of the house, shooting as he was
> running, and then went inside the house.  Tr. 13.

Defendant called 911 from inside the house and eventually arranged to surrender to police.

Officer Willis testified at trial that he ordered Defendant four times to get on the ground, but Defendant only went down on his knees and sat back on his feet.  Defendant kept rubbing his hands back and forth on his thighs, stared at Willis, and would not comply with any of Willis's numerous orders to get down on his stomach.  Defendant placed his right hand on the top of his holstered pistol as if he were about to draw it, so Willis fired a shot from his shotgun.  At the same time, Defendant sprang to his feet and ran, and Willis fired four more shots from his shotgun.  Defendant, Willis testified, returned fire at him, and the bullets hit the ground and threw dirt and rocks on Willis as he ran for cover behind a fence.  After Willis slid behind the fence, at least one more bullet came through the fence in his direction.  Willis denied that there had been any shots fired in the area before he fired his shotgun, and he said he fired because Defendant reached for his pistol.  Tr. 185-91.  Willis said he was certain that it was Defendant who shot at him because he remembered thinking that the suspect's distinctive eyes, visible through the ski mask, looked familiar.  Willis had indeed encountered Defendant in prior criminal matters.  The court notes that Defendant does have distinctive, recessed eyes like Willis described.  Officer Creighton offered similar testimony about the shooting.  Tr. 223-27.

Defendant testified to his version of these events. He said that he walked around the corner of a house and encountered the two police officers.  One of the officers told him to get down, and the other told him to put his hands up, which Defendant said confused him, so he wound up squatting down on the ground with his hands on his legs in front of him.  He claimed that there was then a lot of gunfire coming from another source that landed between him and the two officers, which caused Defendant to run toward a house where two of his co-conspirators were trying to gain entry.  Defendant said he ran around the house, with the officers firing at him, and encountered Tung Nguyen, who was having a problem with his gun.  Defendant said Nguyen took Defendant's gun and shot at whoever was firing in their direction. Attorney Gold asked Defendant: "Did you ever try to shoot one of those officers?" Defendant answered:  "No, sir, I did not."  Tr. 431-34.  On cross-examination, Defendant again denied that he ever went for his gun, that he ever shot at the officers, and he repeated the claim that it was Nguyen who shot at the officers.  Tr. 455.[1]

This issue was explored at the evidentiary hearing.  Attorney Gold testified that he and Kelly Long met with Defendant the night before Defendant testified, and Defendant's testimony from the stand in which he denied any shooting was the first time Gold had heard

---

[1]  The state appellate court noted that evidence in the state trial showed that Defendant fired 13 times at the officers and in an effort to get through a patio door. Defendant's blood-stained pistol, holster, extra magazines, bulletproof vest, gloves, and ski mask were later found inside the house from which he negotiated his surrender. DNA testing linked the blood on some of the items to Defendant. Defendant's pistol had a fresh, fully loaded 14-round magazine in it, and one round in the chamber. State v. Gatti, 914 So.2d at 83.

that version of the events.  Gold said that, based on his interview of Defendant, he had prepared to argue that there had been some shooting but that it was not directed at the police, but Gold had to change his approach once Defendant testified that he did not do any shooting.

Defendant testified at the hearing that he told Gold before trial that he did not shoot at the officers.  The undersigned then questioned Defendant in an attempt to clarify whether he claimed that he told Gold he never fired *at all* or never fired *at officers*.  Defendant said that he was not sure when or if he told Gold that he never fired, and he did not recall talking to Gold about the issue after the opening statement.  Defendant never stated clearly what he told Gold.  He vaguely stated that "my position was always that I did not shoot at the police officer." Hrg. Tr. 152-53.

The court finds attorney Gold's testimony to be credible on this point and believes that Gold delivered an opening statement based on the information that Defendant provided him before trial.  One would reasonably assume that Defendant would have quickly brought it to Gold's attention if the opening statement was off-base in this regard, but Defendant testified at the hearing that he did not talk to Gold about the issue after the opening statements.

It appears that Defendant decided on his own to pursue his line of trial testimony, after telling Gold a different story before trial.  Defendant now attempts to use his change of his story to suggest that Gold made an error, but the court finds that there is no credible testimony to support Defendant's assertions on this issue.  The claim should be denied.

Defendant has also failed to carry his burden of showing that there is a reasonable probability that, but for Gold's challenged remarks in his opening statement, the result of the trial would have been different.  Defendant, it must be remembered, was not charged with shooting at the policemen, and whether he shot at the officers was not critical to any of the four convictions.  Defendant was charged with conspiracy to knowingly use and carry firearms in furtherance of the robbing of an armored car.  The prosecutor's argument for conviction on that count did not rely on any of the events that happened afterward in the Bossier City neighborhood. Tr. 519-20. Defendant was charged with bank robbery, and that conviction was based on taking from the armored car guards property in excess of $500,000 that belonged to a federally insured bank and, during which, Defendant assaulted and put in jeopardy the lives of the guards by use of dangerous weapons.  Count three was for use of firearms during a crime of violence, and the indictment identified the bank robbery as the crime of violence.  The prosecutor's closing argument on counts two and three also relied on the bank robbery, although the prosecutor did mention near the end of his argument about count three that there was also evidence in the form of the testimony from Officers Willis and Creighton about how Defendant acted when they encountered him.  Those events were not, however, critical to the conviction because the indictment and most of the closing argument focused on the bank robbery as the underlying crime of violence.  Count four was for possession of stolen firearms, which the prosecutor identified as a pistol stolen from one of

the armored car guards and a pistol found in the duffle bags of money.  An ATF agent testified that the second pistol was also stolen.  Tr. 524-27.

Defendant argues this claim as if his convictions hinged on whether he (1) fired at the officers or (2) merely defied their lawful orders to surrender, fled from them with his pistol holstered, and then handed the pistol to another man who used it to shoot at the officers. The events that happened in Bossier City were part of the series of events commenced by the robbery, but firing at the officers was not an element of any of the four crimes with which Defendant was charged.  It was admittedly prejudicial to Defendant that there was evidence he fired at the officers, as it demonstrated him to be an evil person, but that evidence was presented through the direct testimony of the police officers. Attorney Gold cannot be faulted for that fact.

Had Gold argued, as Defendant says he should, that Defendant never fired at the officers, the undersigned is convinced that Defendant would just as certainly have been convicted of all four crimes.  Accordingly, Defendant has failed to meet his burden of establishing prejudice stemming from the alleged mistake of counsel.

**Conflict of Interest**

Defendant argues that attorney Gold had an actual conflict of interest because another attorney in his "law firm" represented co-defendant Tung Nguyen, who entered a guilty plea. This issue was explored at the hearing.  Attorney Gold testified that he and attorney Peter Flowers (who represented Nguyen) share office space but are not partners and have no

contract between them.  Gold said that the two lawyers operate as "separate entities" and have in the past represented co-defendants in the same case.  Attorney Kelly Long testified that she also shares office space with Flowers and Gold.  Attorney Gold testified that he and Flowers each chip in to pay Long a monthly stipend for her occasional help with their cases. If Long becomes more involved in a particular case, the attorney with whom she works will share with Long the fee from that case.

Nguyen and Defendant were scheduled to be arraigned on state charges at the same time. Attorney Flowers was not available to appear in the Bossier Parish court for his client, Nguyen, so Ms. Long stood in for him at the arraignment.  Attorney Gold also had a scheduling problem and sent word that he wanted Ms. Long to stand in for him and enter a not guilty plea for Defendant.

Attorney Long testified that she noted the conflict, but there were no other attorneys available at the courthouse to stand in at the arraignment.  Long testified that Judge Bolin discussed the potential conflict and obtained a waiver from Nguyen, and Long "had no other dealings with Mr. Nguyen at all" after the entry of the not guilty plea. Long did not testify at the federal hearing that a similar waiver was obtained from Defendant. She merely said that Defendant was next called up for arraignment, she pled him not guilty, received some stacks of discovery, and walked out the door. Tr. 74-80. Defendant raised this same conflict issue on appeal from his state convictions, and the state court noted that the transcript of Defendant's arraignment "clearly shows" that Long handled the arraignment with

Defendant's "full knowledge and consent."  It added that such an appearance for absent counsel on a minor matter is a common courtesy in the profession, and "[a]bsolutely no prejudice has been shown."  State v. Gatti, 914 So.2d at 92.

Defendant asserts in his briefs that attorney Long participated in "acquiring a deal" for Nguyen and was his co-counsel in the state and federal proceedings, but there was no evidence presented at the hearing to show that or to otherwise challenge attorney Long's testimony that she had no more dealings with Nguyen after the arraignment.

Attorney Long did have further involvement with Defendant.  A week or two before the federal trial began, attorney Gold asked Long to help prepare the case for trial.  Long went to the local jail several times to meet with Defendant.  She did not recall meeting with Nguyen during any of those trips.

Attorney conflicts based upon the representation of multiple or serial clients should be judged under Cuyler v. Sullivan, 100 S.Ct. 1708 (1980). Beets v. Scott, 65 F.3d 1258, 1265 (5th Cir. 1995)(en banc).  "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 100 S.Ct. at 1719. An "actual conflict" exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client. Perillo v. Johnson, 205 F.3d 775, 781 (5th Cir. 2000).

The second element, an adverse effect, is not present if the conflict "did not harm his lawyer's advocacy." Burger v. Kemp, 107 S.Ct. 3114, 3121 (1987).  An adverse effect may be established with evidence that some plausible alternative defense strategy or tactic could have been pursued, but it was not because of an actual conflict that impaired counsel's performance.  Perillo, 205 F.3d at 781.

There is no credible evidence that attorney Gold had any divided loyalties between Defendant and Tung Nguyen.  There is no evidence that Gold ever even talked to Nguyen, which Gold denies, or had any plausible reason to favor the interests of Nguyen over that of his client.

The evidence established that attorneys Gold and Flowers merely shared office space and not the representation of clients.  Defendant's claim that Gold and Flowers were members of the same law firm is without any evidentiary basis.  The fact that attorney Long stood in for both Gold and Flowers at the arraignment to enter not guilty pleas, with the knowing consent of the two defendants, is not enough to characterize attorney Gold as automatically having a conflict of interest.

The undersigned agrees with the state appellate court that there is no evidence of an actual conflict.  Furthermore, Defendant has not established any adverse effect flowing from such an imagined conflict.  There was overwhelming evidence of guilt, and Defendant has not pointed to any plausible alternative defense strategy or tactic that could have been pursued but was not due to Gold's alleged conflict in favor of Nguyen. Defendant offers

general arguments that Gold could have been more aggressive in questioning Defendant in an effort to blame Nguyen – rather than Defendant – for being the robber who fired at two police officers during the manhunt in the neighborhood. Gold asked Defendant to describe those events, and Defendant blamed Nguyen for firing at the officers. Gold had only Defendant's testimony to work with, and he had Defendant present that testimony. It is difficult to fault Gold for Defendant not making a more convincing case on that point.

Defendant argues that Gold could have better investigated the claim that Nguyen was the shooter, but Defendant points to no plausible evidence that would have supported his claim. As discussed below, two police officers testified convincingly that Defendant was the man who shot at them. One of the officers knew Defendant from a prior encounter and was certain of his identification. Also, Defendant was not convicted of shooting at the police during the arrest. He was convicted of robbing an armored car and related crimes, all of which were completed before Defendant traveled to the Bossier City neighborhood where the shooting at issue happened. Even if Gold persuaded the jury that Nguyen was the shooter, Defendant would still be guilty of all four counts charged in the indictment. Defendant has failed on his burden with respect to this claim. It should be denied.

**The Duress Defense**

### A. Introduction

Defendant's remaining two claims are that attorney Gold (1) did not fully investigate Larry Thompson, Sr.'s reputation for violence and present additional testimony concerning

that reputation, and (2) did not offer expert testimony regarding Thompson's overbearing and controlling personality.

Gold did persuade the court to charge the jury on a duress defense.  According to that charge, Defendant was required to prove by a preponderance of the evidence that he was under an unlawful, present, eminent, and impending threat of such a nature as to induce a well-grounded fear of death or serious bodily injury to himself or to a family member; and that Defendant had not recklessly or negligently placed himself in a situation in which it was probable he would be forced to choose the criminal conduct; that Defendant had no reasonable alternative to violating the law; and a reasonable person would believe that by committing the criminal actions he would directly avoid the threatened harm.  Tr. 566-67.

**B. The Trial Presentation**

Gold developed the defense through Defendant's testimony.  Defendant testified at trial that he tried to talk his way out of the robbery plan when Thompson proposed it to him, but Thompson replied, "Pick out a spot on the side of the road and that's where I'll leave you at."  Defendant said he took that to mean that Thompson would leave him dead on the side of the road.  Tr. 417.  Defendant said that Thompson also threatened that if Defendant tried to get out of the truck and run, Thompson would go to Defendant's house, kill Defendant's parents, and wait on Defendant to come home.  Defendant said he believed Thompson and was scared of him because of Thompson's reputation as a murderer.  Tr. 418.

Defendant testified that, after the robbers fled to Bossier City and pulled the van into a resident's garage,  Thompson ordered Defendant (who had car theft experience) to start a Cadillac car that was in the garage. Defendant said he tried to tell Thompson that he could not start such a new model without a key, and Thompson slapped Defendant in the head with a pistol.  Later, when Defendant ran inside a home after being shot by Officer Willis, he called 911 and Thompson's cell phone.  Defendant said he wanted to know if Thompson was dead or alive, which he said would affect whether Defendant surrendered.  He eventually surrendered without learning of Thompson's fate.  Tr. 435-37.

Attorney Gold also developed evidence regarding Thompson's reputation during his cross-examination of police officers who testified for the Government.   For example, Captain William Lott of the Bossier City Police told Gold that he knew Thompson had been suspected in other crimes, including bank deposit burglaries, and Lott had heard that Thompson was a dangerous person.  Tr. 161-62.  Gold asked another officer to describe Thompson, and the officer said Thompson was over six feet tall, weighing 170 to 190 pounds. Tr. 299. (That is substantially larger than the 5' 6" tall Defendant.)  Gold asked FBI agent Brian Long about Thompson's reputation.  Long said he knew that Thompson had been tried and acquitted of a murder, that a movie and book had issued about those events, and he had heard accusations that Thompson committed other violent acts such as shooting his wife. Agent Long agreed that Thompson was a "violent guy," but he made clear during his direct examination that he believed Defendant was also violent and dangerous, long before the

armored car robbery.  Tr. 481-83.  Gold then argued in closing that Defendant did not engage in the robbery willingly and had done so only because he was scared to death of Thompson. He begged the jury not to let the Government "put [Defendant] away because he was afraid of Larry Thompson."  Tr. 535-39.

### C. The Evidentiary Hearing

Defendant argues that Gold should have more thoroughly investigated Thompson's reputation for violence and called both lay and expert witnesses to better support the defense. These issues were explored at length at the evidentiary hearing.

Robert Gatti, Defendant's father, testified at the hearing that he met with attorney Gold several weeks after the armored car robbery to discuss hiring Gold to represent Defendant.  Mr. Gatti recalled that his son Ryan, a local attorney, was also at the meeting at Gold's office.

Robert Gatti testified that he had known Larry Thompson, Sr. for about 50 years, and he knew that Thompson had done illegal things.  He "perceived" Thompson to be a murderer. Robert Gatti described Thompson as being like Dr. Jekyll and Mr. Hyde, but he said he had never seen Thompson's bad side.  He had only heard of that reputation.  He was aware that Thompson's wife had been shot while she was in a deer stand, and he knew that Thompson had been acquitted (based on an alibi defense) in a New Jersey murder-for-hire case that was the subject of a book and movie, both titled "Blind Faith."

Robert Gatti testified that he discussed the potential duress defense at his meeting with attorney Gold.  They also discussed hiring a mental health professional and decided Dr. Mark Vigen (a psychologist) would be best, but Gold did not hire Dr. Vigen.  Mr. Gatti said that he never saw any report from Dr. Vigen regarding Ryan Gatti, but he did hear Dr. Vigen testify at the sentencing hearing for co-defendant Larry Thompson, Jr.  Dr. Vigen testified at that hearing that Thompson, Sr. was a psychopath.

Robert Gatti testified that he believed his son was under the "spell or duress" of Thompson, Sr.  He said that it became apparent to him after the robbery that Defendant was concerned for the safety of the Gatti family.

Robert Gatti testified that Daryl Gold never told him that Gold would not pursue the duress defense but, Mr. Gatti claimed, Gold did not mention duress in his opening statement. That is not accurate. Gold said in his opening that Defendant joined Thompson for what Defendant thought was a truck theft, but Thompson then told him of the bigger plan to rob an armored car. Defendant, Gold said, told Thompson that he did not want to get involved, but Thompson told Defendant that he knew too much so, "You're coming with us or I am going to kill you." Defendant, Gold continued, replied that Thompson would not kill him, to which Thompson was said to threaten to kill not only Defendant but his parents, his brother, and the brother's children. Gold also told the jury that "every law enforcement official around here has wanted Larry Thompson for years" and that Thompson's "reputation is that of a killer, a mean person." Tr. 10-12. Gold may not have used the word duress in his

opening statement, but he did outline the factual basis for the defense on which the jury would be charged.

Mr. Gatti complained at the hearing that Gold did not call an expert to testify regarding Thompson's personality.  He said that he "feels" that it would be "helpful" if there had been such expert testimony at trial and that "perhaps" it "might" have yielded a different result.

Mr. Gatti testified that Gold did not visit Defendant in jail until a week or so before the federal trial.  Mr. Gatti said that he discussed potential investigators with Gold, and Gold had a preference for Cecil Carter.  A call was made to Carter, and a message was left for him.  Mr. Gatti said that was the last he heard of any effort to hire an investigator, and he never saw Carter afterwards in connection with the case.

Mr. Gatti testified that he gave Gold the names of "quite a few" witnesses, and Gold wrote them down.  Mr. Gatti said he later heard from those witnesses that Gold never contacted them.  Mr. Gatti said that Gold had also agreed he would interview the co-defendants, but Gatti thinks Gold interviewed only Thompson, and that was during the trial.

Mr. Gatti said that when Gold asked prosecution trial witnesses about Thompson's reputation, the witnesses had fuzzy recall or did not give much help, not like a defense witness would have been expected to do.  Mr. Gatti added that he believes Thompson was "in the loop," meaning that he was connected to local law enforcement officers.  Gatti did not explain this alleged connection in any detail, and it is not clear if he was suggesting that

the law enforcement witnesses held back on their testimony about Thompson's reputation because of such alleged connection.

Robert Gatti testified that he agreed to pay attorney Gold $20,000 for the federal trial and $10,000 for the state trial.  A canceled check for the federal fee was filed into evidence. Mr. Gatti testified that he scheduled several meetings with Gold after he made payment, but Gold canceled them, walked out the back door, or was otherwise said to be unavailable. Gatti said he never talked to Gold again about the case until the time of trial.

All of the co-defendants pleaded guilty, and only Regan Gatti went to trial. Robert Gatti testified at the hearing that he never discussed a plea bargain with attorney Gold and did not even know that Defendant was going to testify at trial until he saw him take the stand.  Mr. Gatti conceded on cross-examination that he hired attorney Gold to represent his adult son, not himself.

Ryan Gatti is Regan Gatti's brother.  He is a local attorney and, at the time he testified, a hearing officer for the workers' compensation agency.  He accompanied his father, Robert, to the first meeting with attorney Gold.  Ryan Gatti testified that a duress defense was the "primary discussion" at the meeting, and he left believing Gold was going to pursue such a defense. Gold even remarked that everybody knew Thompson, and the men discussed Thompson's reputation for murder.  Ryan Gatti added that he thinks his brother was and is afraid of Thompson.

James Madden is currently a deputy with the Bossier Parish Sheriff's Office.  He testified that he worked for the Bossier City Police Department in the 1980's.  During that time, he believed Thompson was involved in bank night deposit robberies, but he was unable to catch him.  Madden considered Thompson to be a dangerous man who had killed people, including Thompson's wife, and that a threat from Thompson should be taken seriously.  He also believed that Thompson was capable of using threats to make other persons commit crimes.

Deputy Madden testified that he had worked as a high school resource officer and met defendant Regan Gatti during his school years.  He described Gatti as a "Dennis the Menace" type who was from a good family but into "mischief."  (Madden conceded on cross-examination that he was largely unaware that Regan Gatti has several prior arrests and some convictions.) Madden said that Gatti was young and easily influenced, and he did not believe it would be difficult for Thompson to lead Gatti astray.  He also believed that Gatti would legitimately fear any threat Thompson made on the Gatti family.

Jason Colgin testified that he has known defendant Regan Gatti for more than 20 years, and he did not believe Gatti was capable of killing someone.  Colgin has also met Thompson and believes that he is a dangerous person who is suspected of committing murders.  He believes that Thompson is capable of threatening others to assist in crimes, and he thinks Thompson could have frightened Defendant to commit a crime.

Mr. Colgin called Defendant on Defendant's cell phone on the day of the robbery.  A man (who Colgin now believes was a policeman) answered the phone and claimed that Defendant had left the phone with him.  The man asked Colgin who and where he was.  Colgin was at the Horseshoe Casino waiting on Defendant to join him for lunch.  Colgin testified that he had planned to offer Defendant a job with his fire protection business.  Defendant did not make it for the lunch.

Mr. Colgin testified that he called attorney Gold's office and offered to assist in the defense.  Gold never called him or interviewed him.  Colgin testified that he would have told Gold about Thompson's reputation for unlawfulness and murder.  Kelly Long, an attorney who sometimes works with Gold, did return Colgin's call.  The two knew each other from high school.  Colgin said that Long told him she had listened to police recordings that indicated their suspicion (probably based on the cell phone call) that Colgin was involved in the robbery, so she suggested that Colgin stay out of it.  Colgin said he nonetheless would have been glad to testify at trial.  He was not aware of Defendant's prior criminal history, but he said he did know Defendant had experienced some "trouble" with the police and had to go talk with them.

Lorra Alleman testified that her older sister was married to Larry Thompson, Sr. for 13 years.  Ms. Alleman, who was 14 when the couple married, testified that she had seen Thompson act in a sadistic manner, such as he when he sped up his car to intentionally run

over a pet that belonged to Alleman's friends, and Thompson seemed to enjoy informing the owners of the pet's death.

Ms. Alleman testified that her sister went hunting twice in her life.  On her first trip, someone shot at her and missed.  A week later, she nonetheless went hunting again. She was shot and killed while in her deer stand.  Thompson was a suspect but not convicted of the crime.

Ms. Alleman testified that Larry Thompson, Jr. (also known as Neal) was a delightful child, but Thompson, Sr. berated, degraded, and abused the boy.  Ms. Alleman believed that Thompson, Sr. was a psychopath and that he could threaten people into breaking the law. Attorney Gold never contacted her about testifying as a witness, but she did testify at a sentencing hearing for Thompson, Jr.  Ms. Alleman does not know defendant Regan Gatti.

Robert Huck, Jr. met Thompson, Sr. when Huck was working at attorney Ransdell Keene's law office.  Thompson visited the law office several times, one time with defendant Regan Gatti accompanying him.  Huck knew Defendant because the two had dated the same girl.

Huck testified that Defendant seemed very nervous around Thompson, and it took a great deal of effort to get Defendant to eat something.  Defendant stepped out at one time to smoke.  He and Huck chatted, but Defendant got skittish and nervous when Thompson came outside.  Huck said Thompson had Defendant "beat down" like an abused pet that is scared of its owner.  Huck speculated that Thompson planned to kill Defendant and Nguyen after

the robbery.  Huck said he never talked to attorney Gold, but he would have been willing to testify at trial if asked.

Billy Don Maples, retired Deputy Chief of Probation for the Western District of Louisiana, testified that he does not know Thompson, Sr. personally.  He said he did meet Thompson when Thompson was serving a period of supervised released on a federal sentence.  The supervised release expired without revocation.  Maples testified that it was common knowledge that Thompson was a suspect in a number of crimes, including two bank robberies.  Attorney Gold never contacted Maples to testify at the trial of Defendant, who is Maples' nephew by marriage.

Attorney Daryl Gold testified that a duress defense was discussed.  He was aware that Thompson had a reputation as a hit man who had killed his wife and others.  Gold believed that reputation was true, but he also knew that Robert Gatti told him that he and Thompson were good friends, and that Thompson and defendant Regan Gatti were also friends.  Gold testified that Defendant once told him that Thompson would never do anything to hurt Defendant, so it was okay to call Thompson as a trial witness.  Based on these facts, Gold still saw duress as a perhaps the only defense, but he did not personally believe that Defendant had anything to fear from Thompson.

Gold conceded that he did not call any defense witnesses regarding Thompson's reputation. He said that he elected instead to introduce evidence of that reputation through the cross-examination of law enforcement witnesses.  Gold testified that he did not call any

other witnesses on the issue because he got what he wanted from the government witnesses. He elected that strategy over relying on lay witnesses.

Gold testified that Defendant did not give him the names of any of the witnesses who testified in the federal evidentiary hearing about Thompson's reputation. Gold did recall that Defendant wanted to subpoena Buddy Mondello and Bossier Parish District Attorney Schuyler Marvin. Defendant wanted to attempt to establish through those two witnesses that there was a robbery conspiracy in which District Attorney Marvin was involved. Gold did not believe the claim and refused to pursue it.

The rocky relationship between Gold and the Gatti family was evidenced by a note that Gold wrote during the Bossier Parish trial. He expressed frustration with the family trying to run the defense, second guess his decisions, constantly passing him notes, and the like. Gold testified that he had been trying criminal cases for 40 years, usually as a retained attorney, and he had gained quite a few acquittals. He did not appreciate the Gatti family's attempts to micro-manage the defense.

Defendant told Gold that he wanted to call Thompson as a duress witness, so Gold went to see Thompson after Thompson entered a guilty plea. (The record shows that Gold interviewed Thompson during a recess in the trial. Tr. 391.) Gold told Thompson that Defendant said Thompson could help Defendant with a duress defense. Gold then asked Thompson about the alleged threats that Thompson made to Defendant, his father, and his family. Thompson laughed off the suggestions as "ridiculous" and said that Robert Gatti was

a good and longtime friend. Gold asked Thompson who planned the robbery, and Thompson said that it was he and Defendant. (Gold was about to present testimony from Defendant that Defendant had no role in planning the crimes,  in an effort to avoid the conspiracy charges.) Gold came away from the interview convinced that he did not want to call Thompson as a witness.

Gold said that there had been a discussion about hiring an investigator, but he decided based on the discovery materials he received that it would be a waste of Robert Gatti's money to hire a private investigator.  Gold was asked why he did not hire an expert to testify about Thompson's mental state.  Gold said he did not know how he could have lawfully required Thompson to be examined and tested by a psychiatrist or other mental health expert.

Gold said his approach to the duress defense was to rely primarily on Defendant's testimony, as Defendant was the only person who could testify about any threats or intimidation toward him.  And he thought it would be more effective to introduce evidence of Thompson's reputation through the testimony of police officers rather than from lay witnesses.

Gold denied that he ever received a list of witnesses from the Gattis.  He denied that any of the witnesses who testified at the federal hearing had contacted him about testifying at trial.  Gold's calendar was reviewed, and it showed no evidence that any person had called and left a message that he or she wanted to testify for Defendant.

Defendant testified that he told Gold he acted under duress, and Gold reportedly said that if Defendant's parents would get the money to hire Gold, he would then subpoena and interview everybody who knew Thompson.  Defendant testified that he gave Gold many names on the reputation issue, and Gold told him that he would sort it out.

### D. Analysis

Defendant is not entitled to post-conviction relief merely because he can show that his attorney could have presented a better defense.  Counsel, for Section 2255 purposes, is not required to have rendered a perfect performance, but only a performance that, when afforded a presumption of competency and reviewed objectively, was not so deficient as to fall below that of the "counsel" guaranteed by the Sixth Amendment.

The court finds it credible that the duress defense was discussed among Gold, Defendant, and Defendant's family.  Gold certainly did not fail to present that duress defense. He had Defendant, a necessary witness to address the defense, testify quite specifically about the duress issues.  Gold also asked law enforcement officers about Thompson's reputation for violence, and he established that Thompson was a much bigger man than the younger and smaller Defendant.

Gold did not call the reputation witnesses who testified at the evidentiary hearing, but the court finds credible Gold's testimony that he was not given the names of those witnesses, and none of those witnesses contacted him before trial and expressed a desire to testify.  Gold could have hired an investigator to attempt to find more reputation evidence and could have

called some additional reputation witnesses, but it is speculative to assess their impact.  The record was already pretty clear to any rational person that Thompson was an evil and violent person. Calling additional witnesses in that regard would not, in the view of the undersigned, give rise to a reasonable probability that Defendant would have been acquitted.  For these reasons, the claims that attorney Gold should have better investigated the duress defense and called more witnesses on that issue should be denied.

Defendant's claim that Gold should have called an expert psychologist or other expert witness regarding Thompson's mental status should also be denied.  Defendant urges that counsel should have called a witness such as Dr. Vigen, and the parties stipulated that Dr. Vigen's testimony would have been similar to what he offered at the sentencing hearing for Larry Thompson, Jr.  Doc. 419.  Dr. Vigen testified at the hearing that he interviewed Thompson, Sr. for eight hours and came to the conclusion that Thompson was a psychopath, which is a diagnosis that applies to less than one percent of the population.  Dr. Vigen stated that he considered a psychopath one of the four most dangerous of the mental disorders. Thompson, said Dr. Vigen, knew the difference between right and wrong, but he had little conscience.

The testimony from Dr. Vigen would have lent support to Defendant's duress defense, but as noted there was already ample evidence that Thompson was a rash and violent person. Putting a label on his personality might have helped, but it would not provide any direct evidence of actual duress against Defendant.  It would merely show that Thompson was the

kind of person who might engage in such behavior, which was already fairly evident from the record.  Gold might have improved his defense by calling Dr. Vigen (if he could have found a way to compel Thompson to undergo a pre-trial mental examination requested by a co-defendant), but the absence of a mental health witness at trial did not render Gold's performance objectively unreasonable under the circumstances, and the undersigned does not believe that there is a reasonable probability that Defendant would have been acquitted had such evidence been presented.

Accordingly;

**IT IS RECOMMENDED** that Defendant's **Motion to Vacate (Doc. 318)** be **denied**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b).  A party may respond to another party's objections within **seven (7) days** from the filing of the objections.  Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

     THUS DONE AND SIGNED at Shreveport, Louisiana, this 9th day of February, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE